**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SBFO OPERATOR NO. 3, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-CV-03271-JAR |
| | ) | |
| ONEX CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on Defendants' motion for summary judgment in this action arising from a failed business investment.  (Doc. 84).  Plaintiffs operated ten Save-A-Lot grocery stores as independent licensees from 2015 to 2018.  Defendants acquired Save-A-Lot from its parent company in 2016.  In their complaint, Plaintiffs allege that Save-A-Lot and Defendants conspired to induce Plaintiffs to invest millions into a sinking-ship business based on false representations and inaccurate projections, and that they skimmed Plaintiffs' profits by inflating wholesale prices.  In support of the present motion for summary judgment, Defendants centrally contend that Plaintiffs conducted their own due diligence and executed numerous anti-reliance releases precluding their claims here, and further that Save-A-Lot's representations cannot be imputed to Defendants, who also lost their entire investment.  For the reasons set forth below, the Court concludes that Defendants' motion for summary judgment is meritorious and should be granted.

I.      **BACKGROUND**

**Plaintiffs' Transactions with Save-A-Lot**

Plaintiffs are direct and indirect subsidiaries of Honor Capital, LLC, a private equity fund and holding company formed by military veterans as a vehicle for entrepreneurship and community investment.[1]   Mr. James Allen, Jr. is the President, Chief Executive Officer, and General Counsel of Honor Capital.  He possesses a law degree and 35 years' experience in law, real estate development, and investment banking.  His son, Jamie Allen, holds a master's degree in finance and serves as Honor Capital's Chief Financial Officer.  Honor Capital's operating agreement describes its members as sophisticated investors with the financial ability to bear the economic risk of participation in the company. (Ex. 3; Doc. 95-3 at p. 10, § 3.3(c)).

Moran Foods, LLC, doing business as Save-A-Lot (SAL), is a discount grocery chain headquartered in St. Louis, Missouri.  SAL operates "corporate" grocery stores (i.e., managed within its own corporate structure) and also licenses its brand to independent operators.  SAL solicits licensees through its website, which describes SAL as a leader in the "hard discount" market, with a "proven business model" and over 40 consecutive years of growth.  Licensees follow SAL's retail standards and purchase most of their inventory from SAL for resale to consumers.  SAL supports licensee stores through real estate acquisition assistance, store design and planning, training, advertising, accounting, and logistics.

---

[1]      Plaintiff entities are SBFO Operator No. 3, LLC, HC Stores 2017, LLC, SBFO Operator No. 4, LLC, SBFO Operator No. 5, LLC, SBFO Operator No. 6, LLC, SBFO Operator No. 9-Wichita, LLC, and Anchor Mobile Food Markets, Inc. (AMFM).  The Plaintiff stores are part of the Honor Capital corporate structure and were funded by outside investors through Honor Capital and not from members' personal funds.  Doc. 95-1 at p. 26.  AMFM is a separate, independent non-profit entity formed by Honor Capital members to operate grocery delivery trucks carrying SAL inventory purchased by the stores to deliver groceries to customers' homes.  AMFM has no contractual relationship with SAL or Defendants.  AMFM was funded by a loan of approximately $500,000 from Honor Capital's president, James Allen, Jr., and his wife. Doc. 95-1 at p. 25.

In 2014, Honor Capital identified SAL's licensee retail model as an opportunity to create veteran-owned businesses in low-income communities and undertook efforts to open stores in "food deserts" in several states.  The Plaintiff entities were formed for that purpose, with an organizational structure designed to maximize tax credits for investment in underserved communities.  Honor Capital performed due diligence into SAL with the assistance of reputed legal counsel, accountants, banking and finance experts, and other experienced business consultants. Their board of advisors included two CEOs, an economics professor, and an investment banking analyst.  Certain members of Honor Capital attended multiple "Discovery Days" to learn more about SAL licensee operations.  In addition to the general sessions where various SAL representatives explain the retail and advertising programs (Ex. 156, Doc. 108-16), Honor Capital's team arranged for a private meeting with SAL's Vice-President of Licensed Development and "asked him all kinds of questions," which he answered, except for store-specific financial information.  (Ex. 1 at p. 92; Doc. 95-1 at p. 55).  SAL also provided data reflecting its overall growth in 5-year increments.

At least eight of the ten Plaintiff entities signed SAL's standard Receipt, Waiver, and Disclaimer Agreement pursuant to which, for purposes of preliminary discussions, SAL agreed to provide prospective licensees with confidential and proprietary information regarding its business operations and finances in exchange for the recipient's assumption of all risk and waiver of all claims against SAL.  (Ex. 105; Doc. 100).  This agreement states, in sum, that:

- the prospective licensee is a sophisticated investor and will conduct its own independent investigation and risk assessment with respect to SAL's program and any store location;
- the materials provided do not constitute guarantees, warranties, or representations as to actual sales, expenses, results, or success of any store;
- the prospective licensee will not rely on any representation or warranty, whether express or implied, in connection with the materials; and

3

- the prospective licensee waives, releases, and forever discharges SAL, its affiliates, their successors, officers and directors from all past, present, or future claims by the prospective licensee or any other party in connection with the materials.

Among the informational documents provided to Plaintiffs were numerous Save-A-Lot Multiple Analytical Regression Tool (SMART) reports containing location-specific market data, such as consumer demographics and area competitors, and average weekly sales projections.  The reports do not contain any other store-specific projections such as overhead, cost of goods sold, profit and loss forecasts, or revenue by product type.  In order to obtain a SMART report, a potential licensee must sign a Waiver and Release (Ex. 33; Doc. 96-4) stating that:

- the report is based on publicly available data and historic performance of SAL stores generally;
- the report is only a guide and not a substitute for independent due diligence;
- SAL does not make any representation regarding the accuracy or sufficiency of the report;
- the recipient will make its own investigation, analysis, risk assessment, conclusions, and decisions; and
- the recipient waives and releases all claims and assumes all risks arising out of actual results or the recipient's use of or reliance on the report.

Honor Capital signed at least 16 SMART waivers for potential SAL locations.  Honor Capital also prepared its own multi-year pro forma financial projections containing greater detail with respect to sales and gross profits by product type, fixed and variable expenses, payroll, and cash flow.  (Ex. 10, Doc. 95-10 at p. 42; Ex. 24, Doc. 95-16 at p. 5; Ex. 26, Doc. 95-18 at p. 3; Ex. 27, Doc. 95-19 at p. 4; Ex. 28, Doc. 95-20 at p. 5; Ex. 29, Doc. 96 at pp. 26-27; Ex. 31; Doc. 96-2 at p. 15).  In his deposition, Mr. Allen stated that Plaintiffs relied on the SMART reports, but he also acknowledged that SMART reports did not guarantee average weekly sales, and internally

Plaintiffs used more conservative estimates in presentations to lenders.[2]  (Ex. 131, Doc. 107-1 at pp. 9, 13).

Honor Capital opened its first store in May 2015.  In connection with the opening of each new store, Plaintiffs' representatives executed several standard SAL form documents. Pursuant to a License and Supply Agreement (LSA), SAL sells, and the licensee purchases, inventory at "bona fide wholesale prices on such terms as may be established by [SAL] from time to time."  (Ex. 48; Doc. 98-1).  Paragraph 13.C of the LSA, titled Independent Relationship, provides that:

- the agreement shall not be construed to create a franchise relationship;
- SAL does not make any representations or warranties as to the success of the business; and
- the licensee has made an independent investigation regarding the potential success of the business, has evaluated the risks, and has not relied on any representations or warranties by SAL.

Pursuant to a Fixed Income Operating Expense Reimbursement Agreement (FOERA) integrated as an addendum to the LSA, SAL assists licensees with start-up costs by providing a credit toward inventory purchases, payable over two years, subject to the licensee's compliance with SAL operating standards and purchasing quotas. (Ex. 87; Doc. 90-20).  To determine the amount of reimbursement credit for a particular store, the parties generate a cash flow break-even report containing five gross sales scenarios with varying levels of SAL financial assistance.  This report accompanies an Incentive Election Form by which a licensee agrees to a certain reimbursement amount and purchase quota.  For example, for the Winfield location, Plaintiff SBFO5 stood to receive $445,000 in inventory purchase credits over two years, provided it

---

[2]     All references to "Mr. Allen's" testimony correspond to the deposition of James Allen, Jr., President, CEO, and General Counsel of Honor Capital.

purchased 69.4% of its inventory from SAL.  (Ex. 85; Doc. 90-18).  The election form and accompanying report contain disclaimers indicating that:

- the reports are models only, reflecting possible results based on arbitrary sales levels and expense assumptions;

- the reports are prepared from information provided by the operator to evaluate the business opportunity, and SAL makes no representations with respect to actual results, which are subject to numerous internal and external factors; and

- the signatory, on behalf of any entity in which he is a principal, partner, manager, investor, or owner, releases and holds harmless SAL, its parent and affiliated companies, and its officers and directors from any claims or liabilities based on the reports and models or the failure of the store to achieve similar results.

Similarly, pursuant to the FOERA, the retailer acknowledges that there is no guaranty of success and releases SAL, its parent and affiliated companies, and each of their officers and directors from any and all claims of any kind resulting from or related to the store.  (Ex. 87; Doc. 90-20 at p. 8-9, § 13).

SAL makes money from the license arrangement by charging a mark-up of 10-14% on the wholesale products it sells to licensees for retail sale to consumers.  This mark-up is known as the "inside margin."[3]  Other evidence in the record suggests that SAL's competitors charged lower inside margins (e.g., 3-5%).  (Ross Deposition; Ex. 132, Doc. 106-4 at p. 36; Ex. 241, Doc. 106-77 at p. 14; Ex. 242, Doc. 106-78 at p. 18).  SAL also makes money from the license model through fuel surcharges and optional support services such as accounting and technology.

By September 2016, Honor Capital had opened its first three stores in Columbia, South Carolina (SBFO3), Tulsa, Oklahoma (SBFO4), and Winfield, Kansas (SBFO5), and had issued a private placement memorandum soliciting capital for additional stores.  The offering stated that

---

[3]    Defendants' July 2016 due diligence memo indicates that they understood the margin to be approximately 10% at that time.  (Ex. 116 at p. 21; Doc. 101 at p. 22).  Their final memo dated September 2016 reflects an inside margin of 14% for the preceding 12 months.  (Ex. 117, Doc. 101-1 at p. 21).  Other evidence explains that SAL's inside margin of 14% minus its distribution costs results in a profit margin of 9%.  (Ex. 209, Doc. 106-47; Ex. 210, Doc. 106-48 at pp. 14, 43).

Honor Capital's officers collectively possessed nearly 100 years of experience in relevant industries, namely real estate, retail operations, supply chain, distribution, sales and marketing, investment banking, and law.  (Ex. 114; Doc. 100-9 at p. 62).  The offering disclosed numerous risks inherent in the grocery business (e.g., pricing competition, small margins, economic conditions such as deflation, food stamp reductions) and cautioned investors that results were not guaranteed.  (Ex. 114; Doc. 100-9 at p. 37-44).  Mr. Allen acknowledged in deposition that Plaintiffs "weren't very good at what we were doing" and "stumbled quite a bit with our first few stores."  (Doc. 95-1 at p. 98).  He also noted that the industry experienced the longest period of deflation in decades.  (Id. at p. 107).[4]

**Onex Acquisition**

Defendant Onex Corporation (Onex) is an investment management firm specializing in private equity, credit, and wealth management.  Onex engages in private equity transactions through various limited partnerships, including Defendant Onex Partners IV, LP.  Defendants Anthony Munk and Matthew Ross are Onex executives.  In 2015, Defendants set out to acquire SAL from its parent company, SuperValu, Inc., and conducted extensive due diligence into 2016 toward that aim.  According to Defendants' internal memoranda, SAL's earnings were in decline due to poor management, and Defendants viewed the acquisition as an opportunity to turn the company around for a return on investment within five years.  Notes from expert consultations in July 2016 reflect the following findings and recommendations:

- The average cost to open a store is $1.4 million, with the average subsidy from SAL being $400,000.  It takes roughly eight years to break even on the $1 million investment.  Approximately 50% of licensees would not likely break even within that time.

- SAL did not use appropriate metrics to focus on growing topline sales.

---

[4]      Defendants, too, noted this deflationary trend in their due diligence risk assessment.  (Doc. 101-1 at p. 40).

- Prices are too high for a low-cost operator.
- Inventory was not managed efficiently.
- Store locations are poorly selected.
- "Improve the economics for licensees. The healthier the licensees the better."

(Ex. 185, Doc. 106-26; Ex. 18, Doc. 106-29)

Defendants' introductory due diligence memorandum dated July 2016 states, "Our thesis is that separating Save-A-Lot from SuperValu and investing in the business will give licensees confidence in the future of the Company and help restart growth.  As well, if merchandising and operating standards are improved, licensee store economics will improve." (Ex. 116 at p. 22; Doc. 101 at p. 23).

Defendants' final due diligence memorandum, dated September 21, 2016, reflects the following findings and expectations:

- SAL was even more poorly managed than Defendants understood at the beginning of their research. Defendants noted a fundamental lack of operating processes and fact-based decision-making across most functional areas.
- A successful investment would require improvements in all functional areas but especially merchandising, marketing, procurement, and operations.  This would require a significant turnaround at a time when the food retail industry is facing headwinds.  Cost savings opportunities were identified in procurement, store operations, and distribution, and new merchandising initiatives were expected to improve sales productivity.
- Key risk factors included the ability to execute the turnaround, which could require a change in management during which earnings may decline; prolonged deflation; the expiration of a 2009 food stamp program; industry-wide price competition; and competitor expansions.
- Licensee store count was in decline between 2013 and 2016 due to SAL's prioritization of corporate stores.  During that same period, compounded same store sales growth was 0.2% per annum.  Licensees are required to purchase about 65% of their inventory from SAL at "bona fide wholesale prices."  Licensees generally have lower revenue and gross margins, but only 10% of licensee stores for which Defendants received data had a negative EBITDA.[5]
- Most corporate and licensee stores were healthy and could be expected to generate cash flow during the turnaround.  Existing licensees would continue to invest and likely expand

---

[5]     EBITDA refers to earnings before interest, taxes, depreciation, and amortization.

faster once independent of SuperValu.  Licensees were optimistic about SAL's new direction, with their top concern being wholesale pricing.

- Defendants' base-case forecast projected a compounded annual growth rate (CAGR) of 4.6% from 2017 to 2022, driven in part by a net addition of 45 licensee stores and an increase of $229 million in sales from the implementation of turnaround initiatives.

(Ex. 117; Doc. 101-1)

After extensive due diligence, on October 16, 2016, Onex entered into an agreement to purchase SAL for $1.365 billion, including $660 million in equity investments by various Onex entities. (Ex. 279; Doc. 106-109).  The acquisition closed on December 5, 2016.  Defendants Munk and Ross were appointed to SAL's Board of Directors.  By that time, Plaintiffs were projecting an operational loss of $490,000 for its first three stores for 2015-2016.  While some of those losses were attributable to sales below SMART projections, other amounts represented excess costs. (Ex. 113, Doc. 100-8).  Globally, too, SAL's store sales trends for that period reflect significant losses due to deflation and food stamp reductions.  (Ex. 190, Doc. 106-31 at p. 12).  After the Onex acquisition, Plaintiffs opened or acquired four more stores in Wichita, Kansas (SBFO9), Aiken, South Carolina (SBFO3), Augusta, Georgia (HC Stores), and Danville, Virginia (HC Stores). In late 2017 and early 2018, Plaintiffs opened their final three stores in Mooresville, North Carolina (SBFO6), Oklahoma City, Oklahoma (HC Stores), and Altus, Oklahoma (HC Stores).

Defendants retained the same business consultants involved in due diligence to assist with SAL's turnaround after the acquisition.  They developed an 18-month comprehensive transformation plan to "fix many areas at once."  (Ex. 252; Doc. 106-88).  In early 2017, a presentation to the Onex advisory board identified Defendants' plans to improve SAL's branding and merchandising, in-store operations, and procurement and distribution, for an improvement of $115-205 million in EBITDA.  (Ex. 260; Doc. 106-96 at p. 24).  Defendant Ross considered how to improve the licensee model through growth rebates, good real estate decisions, regular reviews,

and better communications.  (Ex. 259; Doc. 106-95).  Ross wanted Onex to help Plaintiffs, specifically, to acquire the best real estate under favorable terms.  (Ex. 197; Doc. 106-36).  In April 2017, Defendants hired two of their due diligence advisors in key SAL executive roles.  Kenneth McGrath was appointed Chief Executive Officer, and Kevin Proctor was named Chief Investment Officer to lead SAL's real estate strategy and store development.  Under McGrath's leadership, SAL began referring to licensees as "retail partners" to reflect the view that they were in business together.  (Ex. 132, Doc. 106-4 at p. 17).

Defendants' plans and efforts to implement improvements across all aspects of the business are reflected in myriad exhibits throughout the record.  (e.g., Ex. 143, Doc. 106-8; Ex. 210, Doc. 106-48 at p. 50; Ex. 219, Doc. 105-55; Ex. 227, Doc. 106-63 at pp. 40-69; Ex. 231, Doc. 106-67; Ex. 242, Doc. 106-78; Ex. 252, Doc. 106-88; Ex. 254, Doc. 106-90; Ex. 255, Doc. 106-91; Ex. 260, Doc. 106-96 at p. 24, 26).  Pre-closing lender communications reflect that Defendants intended to lower the inside margin.  (Ex. 210, 106-48 at p. 43, 57).  A portfolio review dated April 2017 notes that transformation initiatives were still being planned and tested and acknowledged that licensees' patience was wearing thin due to financial pressures.  (Ex. 219, Doc. 106-55 at p. 16).  SAL viewed Honor Capital as a promising licensee, "masterful in their store operations because of their discipline."  (Ex. 199, Doc. 106-38).

As of May 2017, SAL's inside margin on Plaintiffs' stores ranged from 12.7% to 13.8%.  (Ex. 238, Doc. 106-74).  In September 2017, Defendants developed a Licensee Impact Program to fund store improvements.  (Ex. 143, Doc. 106-8).  In October 2017, Defendants and SAL reorganized the real estate department and engaged a third-party analytics firm, Intalytics, to provide more sophisticated analytics replacing SAL's SMART reports, which Defendants deemed inaccurate and subjective.  (Ex. 217; Doc. 106-53).  In November 2017, SAL's Board of Directors

reviewed a 5-year plan that included the opening of 215 new licensee stores and a reduction in SAL's inside margin from 14% to 12%. (Ex. 127 at p. 6; Doc. 101-10 at p. 8). A revised plan in December 2017 provided no decrease in the inside margin for 2018. (Ex. 282; Doc. 106-112 at p. 7). A cash flow analysis dated March 2019 reflects an increase in the inside margin from 12.6% in January 2018 to 15.6% by the end of that year. (Ex. 140, Doc. 106-76).

Ultimately, Defendants' plan to revive SAL did not succeed. Plaintiffs allege that SAL failed to reduce its inside margin, it eliminated staff and disrupted supply chains and vendor relationships, and it failed to satisfy deliveries of inventory, resulting in declining sales. In October 2017, Mr. Allen wrote to Kevin Proctor criticizing SAL's Vice-President of Licensed Operations for undermining Plaintiffs' efforts in multiple instances. (Ex. 216, Doc. 108-31). In March 2018, Plaintiffs informed SAL that they were facing expected losses of $2,000 per week per store and over $1 million annually in aggregate. (Complaint at ¶ 122). These losses were allegedly consistent with SAL's business as a whole, which Plaintiffs claim experienced a 94% drop in EBITDA in less than three years. (*Id.* at ¶ 119; Ex. 30, Doc. 96-1 at 12). Throughout the spring of 2018, SAL's new management team attempted to institute improvements with respect to pricing, distribution, and marketing.

In late June 2018, Plaintiffs offered to sell their stores to SAL, but SAL declined the offer. In August 2018, Honor Capital's primary financer withdrew from the investment. As Plaintiffs contemplated legal action, conflicts arose regarding operation of the stores and financial arrangements between Plaintiffs and SAL. (*Id.* at ¶¶ 139-143). For example, Plaintiffs allege that SAL withdrew advertising assistance, failed to credit earned incentives, and started requiring cash payment on delivery notwithstanding amounts on deposit. SAL reduced deliveries to Plaintiff stores, leaving shelves empty. By the end of 2018, Plaintiffs had closed all ten stores. (*Id.* at ¶

145).  By 2019, Onex had lost its entire investment.  (*Id.* at ¶ 7).  Based on the overall record, it appears that a perfect storm of prolonged deflation, food stamp reductions, organizational chaos, and superior competition was fatal to all parties.

**Procedural Background**

In December 2019, Plaintiffs filed the present lawsuit against Defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I), RICO conspiracy (Count II), fraudulent inducement (Count III), negligent misrepresentation (Count IV), civil conspiracy to commit fraud (Count V), aiding and abetting fraud (Count VI), and civil conspiracy to breach contract (Count VII). Plaintiffs allege that SAL made numerous misrepresentations on its website, during Discovery Days, and in other meetings that induced Plaintiff to execute SAL's standard licensing contracts. Plaintiffs further allege that SAL charged higher than bona fide wholesale prices in violation of the LSAs and actually operated a franchise model without the requisite disclosures.  Defendants moved to dismiss the complaint on the grounds that Plaintiffs executed broad contractual releases and expressly disclaimed reliance on the statements in question. (Doc. 31).  In response, Plaintiffs asserted that the contractual releases were not at issue at the motion-to-dismiss stage and moreover were procured by fraud. (Doc. 37 at 10).

Because Defendants' lengthy motion to dismiss raised matters outside the pleadings, the Court converted it into a motion for summary judgment pursuant to Rule 12(d) and allowed the parties to submit supplemental briefing. (Docs. 43, 45-57).  Invoking Rule 56(d), Plaintiffs requested an opportunity to engage in further discovery, which the Court granted.  Given that the parties' factual dispute largely centered around alleged misrepresentations inducing Plaintiffs to become SAL licensees, the Court ordered Plaintiffs to produce communications with SAL and

Defendants relevant to Plaintiffs' decision to enter into the transactions, and the Court ordered Defendants to produce the communications and deal files of Ross, Munk, and any others on the deal team mentioning Plaintiffs and their principals or stores.  (Doc. 61).  Although the Court limited Plaintiffs' request for additional discovery reflecting Defendants' intentions when it invested in SAL, the summary judgment record nonetheless contains voluminous evidence of Defendants' investment thesis and high hopes for SAL and its licensees.  After Defendants produced over 5,600 documents, Plaintiffs' subsequent request to further expand discovery was denied.  (Doc. 76).

Defendants then filed the present renewed motion for summary judgment now before the Court.  The parties have submitted statements of material fact comprising roughly 800 paragraphs, supported by 283 exhibits consisting of, *inter alia*, deposition testimony by Honor Capital's CEO, James Allen, and Onex's Managing Director, Defendant Matthew Ross; SMART reports and licensee contracts for Plaintiffs' stores; Power Point pitches to lenders and investors; business plans; financial statements and projections; Onex's due diligence memoranda and underlying documents regarding the SAL acquisition; SAL training and marketing materials; and internal and external correspondence between and among representatives of SAL, Plaintiffs, and Defendants. Upon review of this voluminous record and consideration of the parties' arguments, the Court concludes that summary judgment is proper because the record does not contain disputable evidence that SAL or Onex fraudulently induced Plaintiffs to enter into the agreements so as to invalidate the anti-reliance disclaimers therein, or that Defendants conspired to continue SAL's allegedly fraudulent scheme.

## II.    LEGAL STANDARDS

### Summary Judgment

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *See Meier v. City of St. Louis*, 934 F.3d 824, 827-28 (8th Cir. 2019). The party opposing summary judgment may not rest on the allegations in its pleadings; it must set forth specific facts showing that there is a genuine issue of material fact for trial.  *United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006).  A fact is material if it relates to the legal elements of the claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.*

Summary judgment may be appropriate when "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The non-moving party may not rely on allegations or denials but must substantiate its allegations with sufficient probative evidence that would permit a finding in its favor on more than mere speculation or conjecture. *Ball v. City of Lincoln, Nebraska*, 870 F.3d 722, 727 (8th Cir. 2017). Even if some factual dispute exists, if the evidence, taken as a whole, is so one-sided that a fair-minded trier of fact could not find for the non-moving party, then there is no genuine issue for trial, and the movant is entitled to summary judgment. *Id.*

### Fraud Exception to Non-Reliance Disclaimers

Under longstanding Missouri Supreme Court precedent, release language that is plain and unambiguous on its face will be given full effect within the context of the agreement *unless* the release is based on fraud, accident, misrepresentation, mistake, or unfair dealings. *Blount v.*

14

*Nicholay*, 4:15 CV 322 DDN, 2019 WL 1275011, at *4 (E.D. Mo. Mar. 20, 2019), citing *Andes v. Albano*, 853 S.W.2d 936, 941 (Mo. 1993).   A party may not, by disclaimer or otherwise, contractually exclude liability for fraud in *inducing* a contract.   *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 767 (Mo. 2007).   A plaintiff attempting to prove fraud under Missouri law must show: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.   *Vogt v. K&B Auto Sales, LLC*, 4:22-CV-00385-SRC, 2022 WL 2340570, at *2 (E.D. Mo. June 29, 2022) (citing *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-132 (Mo. 2010)); *Big A LLC v. Vogel*, 561 S.W.3d 28, 35 (Mo. App. W.D. 2018) (enumerating the same elements for fraudulent inducement).   Failure to establish any one of these elements is fatal to recovery. *Renaissance Leasing*, 322 S.W.3d at 132.

Although materiality is generally a fact question for the jury, the issue is appropriate for summary judgment when the misrepresentation is of such a nature that all minds would agree about its materiality.   *Lafarge N. Am., Inc. v. Discovery Group L.L.C.*, 574 F.3d 973, 982 (8th Cir. 2009) (applying Missouri law).   A representation is material if a reasonable person would attach importance to it in making a choice of action.   *Id*.   The test is an objective one based on the facts and circumstances of the transaction in question.   *Id*.   It is not, subjectively, whether the misrepresentation affected the conduct of the particular buyer, but rather, objectively, whether it would have affected the conduct of a reasonably prudent buyer.   *Id*.

Likewise, despite the general rule that reliance is a fact issue for the jury, a party who

undertakes an independent investigation does not have the right to rely on the misrepresentations of another *unless* (1) the investigating party makes only a partial investigation and relies on both the inspection and the misrepresentation; (2) the buyer lacks equal footing to learn the truth, and the facts are not easily attainable but are within the particular knowledge of the seller; and (3) the seller makes a specific and distinct misrepresentation. *Renaissance Leasing*, 322 S.W.3d at 132-133 (granting summary judgment where plaintiffs made an independent investigation).

## III.   ANALYSIS

In support of their motion for summary judgment, Defendants centrally contend that, by signing SAL's contracts and related documents, Plaintiffs executed broad releases of all potential claims relating to their stores and disclaimed any reliance on alleged misrepresentations by SAL or Defendants. Plaintiffs counter that the releases and disclaimers are void because they were fraudulently obtained, which Plaintiffs seek to establish through additional discovery.

### Contracts in the Record

As an initial matter, Plaintiffs object to the admissibility of certain contracts with respect to certain stores based on the particulars of the discovery process and whether the versions in the record are fully executed.  The Court is not persuaded that this dispute is material for purposes of summary judgment.  The record contains signed LSAs, Incentive Election Forms, and FOERAs, for all ten stores containing the broad releases described above.[6]  Honor Capital signed at least 16 SMART waivers while scouting possible store locations.  Plaintiffs received SMART reports for

---

[6]     To the extent that certain FOERAs in the record lack SAL's signature, the Court does not agree with Plaintiffs' interpretation that their own signed releases are not binding against them, as the contract provision referring to SAL's execution merely entitles SAL to final approval.  Moreover, Plaintiffs' breach of contract claim necessarily implies that Plaintiffs deem these agreements valid and enforceable. Further, even disregarding the particular FOERAs lacking SAL's signature, the record contains ample other evidence of agreements precluding Plaintiffs' reliance as relevant to the present motion.  The absence of SAL's signature on these few documents does not change the Court's analysis.

seven of their ten stores and state that they did not rely on SMART reports for their other three stores.  Mr. Allen confirmed in deposition that potential licensees were required to execute SAL's standard contracts as a condition of operation.  (Doc. 95-1 at pp. 80, 86, 110).  Honor Capital's members were authorized to act on behalf of all Plaintiff entities.  (Docs. 50-55 ¶ 1).  Defendants, for their part, support their present motion with copies of all standard documents executed by each Plaintiff store.  (Doc. 95, pp. 82-98, referring to contracts at Exhibits 32-98).

The standard for admissibility at the summary judgment stage is simply whether the evidence in question could be presented at trial in admissible form.  *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012).  Based on the voluminous record, the Court is confident that Defendants could present admissible evidence establishing that each Plaintiff store executed standard SAL documents containing the releases and waivers relevant to the central issues here.[7]

**Fraudulent Inducement (Count III)**

On the merits, the Court begins with Plaintiffs' claim of fraudulent inducement, as it is central to all other counts.  Plaintiffs allege six distinct misrepresentations by SAL that Plaintiffs claim induced them to sign SAL's contracts.  Specifically, Plaintiffs allege that:

1. SAL misrepresented on its website that it had over "40 consecutive years of growth," though Defendant Ross conceded that he could not identify any metric supporting that statement.

2. SAL misrepresented on its website that its retail advertising program provided a "proven business model," though Defendants deemed it deficient in all functional areas.

3. SAL misrepresented on its website and in the LSA that it was a "hard discount" grocer, though the evidence suggests that SAL's pricing was much higher than its competitors.

4. SAL misrepresented that it sold inventory to licensees at "bona fide wholesale prices" when in fact SAL charged a mark-up to generate its own revenue.

---

[7]    The same is true for other documents for which Plaintiffs question admissibility, such as SAL's five-year plan, which Plaintiffs both attack and invoke for their own purposes.  (Doc. 116 at pp. 122-23).

5. SAL misrepresented that it was not a franchise and did not charge franchise fees, when in fact SAL's wholesale mark-up constituted a hidden franchise fee.

6. During due diligence, SAL misrepresented the failure rate of licensee stores to be no more than 4% when in fact it was five times higher.

Plaintiffs assert that these statements were material, that SAL knew them to be false and intended for Plaintiffs to rely on them, and that Plaintiffs were entitled to and did rely on them as true. Applying the above-cited precedent to the present record, the Court concludes that Plaintiffs' assertions do not create genuine issues of material fact in dispute to withstand summary judgment.

Website Statements

First, objectively, no reasonably prudent buyer would place material significance, let alone transactional reliance, on the vague promotional statements on SAL's website. *See e.g., City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (deeming references to "proven strategies" and "industry-leading position" inactionable as corporate puffery). SAL's website puffery, touting "40 consecutive years of growth" using a "proven business model" of "hard discount pricing," is clearly intended to solicit the interest of potential licensees, but it is far too vague to be material or inducive of reasonable reliance for purposes of entering into a binding contract.[8]  *See e.g., Meyer v. Ward*, 2017 WL 6733726, at *8

---

[8]     Plaintiffs allege additional misrepresentations on SAL's website such as "now is a perfect time to become a Save-A-Lot licensee" and promising "long-term support," "necessary tools to compete," and "unrivaled support services."  These phrases, too, are vague, inactionable corporate puffery. When Defendant Ross was asked in deposition whether he looked at SAL's website during Onex's due diligence, he replied: "My experience in doing this for 25 years is [that] there's practically no information available on a website that's of material value relative to what you can get from asking the company to produce documents." (Doc. 106-4 at p. 29.)  Plaintiffs' characterization of Ross's "concession" on the issue of 40 years of growth is inaccurate.  When asked in deposition if he knew of any metric supporting that representation, Ross replied: "I didn't look at 40 years' worth of data.  It was not made available to us, so I can't confirm or deny that on any metric."  He continued, "I don't have a metric in mind that whoever wrote this website and posted this would be referring to. I just never investigated this issue."  (cleaned up) (Doc. 106-4 at p. 30.) Ross did not concede that he knew the representation to be false, as Plaintiffs imply.

(N.D. Ill. Dec. 18, 2017) (deeming representations of an "excellent track record" and "positive returns for every client every year since 1998" puffery and thus not material).

Based on the facts and circumstances of this transaction – where a sophisticated buyer conducted its own due diligence with a team of professional advisers – the Court finds no triable fact question on the materiality of the statements on SAL's website.[9]

<u>Pricing</u>

Next, Plaintiffs claim that SAL misrepresented its intent to charge bona fide wholesale prices for inventory, instead imposing a steep mark-up to buoy its own balance sheet.  In a related point, Plaintiffs argue that SAL misrepresented itself as "not a franchise" while charging a hidden franchise fee in the form of its inside margin.  These theories are unavailing.

Plaintiffs cannot credibly claim to have been unaware that SAL charged a mark-up.  They acknowledge in their complaint that wholesaler mark-ups are standard in the industry as part of the bona fide wholesale price.  (<u>Doc. 1 at</u> p. 23, ¶ 71).  Rather, Plaintiffs only challenge the percentage of SAL's mark-up as excessive.  But they supply no authority for the premise that a wholesaler's mark-up beyond a certain percentage constitutes a franchise fee.  At least one district

---

[9]     The term "hard discount pricing" is no more actionable when found in the LSA, which merely states that the "intent of the [SAL] Program is to operate a hard discount, limited assortment grocery store" offering products at "an everyday low price below the retail price established by conventional grocery outlets in the market served."  (Ex. 48; <u>Doc. 98-1 at</u> p. 4). Pointing to Ross's testimony that the term "hard discount pricing" is "understood in the industry," Plaintiffs argue that SAL either *was* <u>or</u> *was not* a hard discount grocer at the time of contracting.  But neither the contract, nor Ross's testimony, nor the record as a whole support such a precise binary.  Ross simply described "hard discount" as lower than conventional retail grocers, with limited selection and lean operations.  (Ex. 132, <u>Doc. 106-4 at</u> p. 15).  *See also* Ex. 219, <u>Doc. 106-55 at</u> p. 26 (listing elements of hard discount as (1) limited assortment, (2) private brand, (3) small location, and (4) low-cost operations).  Taken in context, the diligence notes on which Plaintiffs rely, indicating that SAL "[wasn't] running the model anymore," merely underscore SAL's poor execution.  (Ex. 228, <u>Doc. 106-64</u>). The overall record consistently reflects that SAL did operate as a hard discount grocer but lacked product discipline (see e.g., Ex. 229, <u>Doc. 106-65 at</u> p. 11) and was consistently undercut by its primary competitors in that market, particularly ALDI (Ex. 220, <u>Doc. 106-56 at</u> p. 10).  So, even were this representation specific enough to be material, voluminous evidence precludes an inference that it was false.

court in this circuit has concluded that even a 35-50% mark-up is not a franchise fee.  *See e.g.,*
*Coyne's & Co., Inc. v. Enesco, LLC*, CIV.07-4095, 2007 WL 3023345, at *3 (D. Minn. Oct. 12,
2007), *aff'd*, 553 F.3d 1128 (8th Cir. 2009) (reasoning that the mark-up was simply the distributor's
profit).  At best, the evidence suggests that SAL's inside margin of 12-14%, of which its gross
profit was only 9%, was higher than its competitors, perhaps by an additional 8-10%.  The Court
is not persuaded that this creates a material, triable question as to SAL's status as a franchise,
particularly in light of the overall record.

The evidence consistently reflects that no party or person involved in the various
transactions at issue here, including SAL or Defendants, considered SAL's license model as a *de*
*facto* franchise.  Plaintiffs' own internal communications, their external representations, and the
contracts themselves repeatedly refer to a licensor/licensee relationship. The LSA expressly states
that it should not be construed as creating a franchisor/franchisee relationship.  Plaintiffs were
advised by reputable legal counsel throughout the process. Defendants, too, examined the
differences between typical franchise and license arrangements and considered the possibility of
converting to a franchise model.[10]  (Ex. 188; Doc. 106-29 at p. 24; Ex. 261, Doc. 106-97 at p. 4).
Lender communications note that SAL is "careful that it not cross into franchise territory."  (Ex.
210, Doc. 106-48 at p. 22).  Notes from March 2017 acknowledge that the wholesale model
imposing an inside margin lacks the vertical alignment of the franchise model based on a
percentage of sales. (Ex. 259, Doc. 106-95).  Similarly, a licensee strategy discussion dated
November 2017 notes the inherent tension between SAL and licensees, as SAL's inside margin is

---

[10]     Defendants' July 2016 due diligence memo states: "The licensee model employed by Save-A-Lot
differs from a more typical franchise arrangement in that Save-A-Lot is primarily a wholesale distributor
of grocery products to licensee stores.  Save-A-Lot does not charge a royalty fee for use of the brand name.
Rather, it enters into license and supply agreements with the licensees, under which Save-A-Lot agrees to
license its name to the licensees and the licensees agree to purchase the majority of their inventory from the
Company."  (Ex. 116; Doc. 101 at p. 21-22.)

licensees' cost.   (Ex. 261, Doc. 106-97 at p. 8).   This discussion included the possibility of converting to a franchise model.   (*Id.* at p. 10.)   There is simply no evidence in the summary judgment record from which a reasonable juror could infer that SAL falsely claimed to be a licensor when it was really a franchisor.

Further, the Court is not persuaded that Plaintiffs' fraud claim with respect to SAL's wholesale pricing is cognizable.   In a suit involving a commercial transaction between merchants, a fraud claim to recover economic losses is precluded by the economic loss doctrine unless independent of the contract.   *Self v. Equilon Enterprises, LLC*, 4:00-CV-1903-TA, 2005 WL 3763533, at *8-11 (E.D. Mo. Mar. 30, 2005) (reviewing Missouri law and concluding that plaintiff's misrepresentation claim relating to defendant's pricing was barred by the economic loss doctrine).   The doctrine does not, however, bar claims of fraudulent inducement.   *Trademark Med., LLC v. Birchwood Laboratories, Inc.*, 22 F. Supp. 3d 998, 1003 (E.D. Mo. 2014).   Plaintiffs thus present their claim as one of fraudulent inducement by asserting that SAL had no intention of charging legitimate bona fide wholesale prices and Plaintiffs would not have entered into SAL's agreements had they known about SAL's high inside margin.   But Plaintiffs' characterization is unavailing.

Claims of misrepresentation of a party's *intent* to perform its contractual obligations are barred by the economic loss doctrine because the failure to perform can be remedied through a breach of contract action.   *Jacobson Warehouse Co., Inc. v. Schnuck Markets, Inc.*, 4:17-CV-00764-JAR, 2017 WL 5885669, at *7 (E.D. Mo. Nov. 29, 2017).   By contrast, the doctrine does not bar claims based on misrepresentations of a party's *ability* to perform, which Plaintiffs do not allege here.   *Id.*   Courts focus on "whether a contract term conflicts with or contains the alleged misrepresentation, in which case the inducement claim is barred."   *Id.*   Here, the LSA expressly

states: "Licensor shall sell and Licensee shall purchase Inventory at bona fide wholesale prices on such terms as may be established by Licensor from time to time."  Plaintiffs' claim relates precisely to SAL's intent to perform and actual performance of this term of the contract.  Plaintiffs' Count VII, asserting conspiracy to breach contract, further confirms the true nature of Plaintiffs' claim on this point as a breach of contract claim.  Thus, even accepting *arguendo* Plaintiffs' assertion that SAL's pricing exceeded bona fide wholesale pricing, their claim goes directly to SAL's intent to perform a specific term of the contract and is therefore barred by the economic loss doctrine.[11]

Failure Rate

Plaintiffs' claim that SAL misrepresented its store failure rate requires closer examination, but ultimately the record is insufficient to raise a material factual dispute.  According to Plaintiffs, relying only Mr. Allen's declaration, SAL's Vice President of Licensed Development told Honor Capital's due diligence team in September 2014 that the store failure rate was "less than 1%" and usually attributable to an operator's age or illness.  Around the same time, SAL sent Honor Capital a lender presentation indicating a "fail rate of 3-4% since 2009."[12]  (Ex. 135; Doc. 106-6).  Plaintiffs assert, however, that the actual failure rate was over 20%, based on historical data collected by Defendants in October 2017 showing, *by decade*, the number of stores opened and closed compared to the total number of stores.  (Ex. 143; Doc. 106-8 at p. 41).  Plaintiffs contend that they could not have ascertained this discrepancy through independent investigation.

Plaintiffs appear to concede that Mr. Allen's recollection of a 1% failure rate, unsupported by other evidence, is self-serving hearsay and insufficient to create a genuine issue of material fact.

---

[11]   The parties also dispute, in competing footnotes, whether Plaintiffs' contract claims against SAL should be submitted to arbitration pursuant to the arbitration clause in the LSA.  The Court will not opine on the matter on such limited briefing and considers the issue outside the scope of the present case.

[12]   Plaintiffs have not supplied the cover email by which SAL sent this presentation to Honor Capital.

*Pace v. Wells Fargo Bank, N.A.*, 4:11-CV-489 CAS, 2012 WL 3705088, at *6 (E.D. Mo. Aug. 27, 2012) (citing *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006)).  The parties instead focus on the 4% rate quoted in the lender presentation, which Defendants argue is not necessarily false, because store *failure* is a smaller subset of store *closures*, which may be attributable to retirement or other non-financial factors.  Indeed, the statistical data in the record refers only to closures, and Plaintiffs' extrapolation of decennial figures to arrive at a 20% rate is inconsistent with more detailed yearly statistics in the record.

Defendants' due diligence dated December 2015 shows the number of licensee stores from 2011 to 2014.  (Ex. 178; Doc. 106-19 at p. 21).  Defendants' overview dated October 2017 shows yearly closures during that period.  (Ex. 143; Doc. 106-8 at p. 41).  Together these figures reflect a closure rate of roughly 2.8% to 3.7%.[13]  Defendants' due diligence dated August 2016 reflect closure rates of roughly 2.2% to 4.1% for the same period.[14]  (Ex. 186, Doc. 106-27).  Defendants' due diligence memo dated September 2016, containing yearly statistics from 2013 to 2016, indicates a licensee closure rate of approximately 4% to 6%.  (Ex. 117; Doc. 101-1 at p. 22).[15] Though these figures vary slightly, the record forecloses a finding that SAL knowingly and falsely represented a failure rate in the range of 4% from 2009 to 2014, and it plainly refutes Plaintiffs' assertion that the rate was over 20%.  Moreover, SAL provided this general datapoint as part of a Power Point presentation for Honor Capital's use in fundraising from outside investors.  This does

---

[13]    In 2011, 26 of 899 licensee stores closed (2.8%).  In 2012, 35 of 935 stores closed (3.7%).  In 2013, 28 of 950 stores closed (2.9%).  In 2014, 32 of 948 stores closed (3.4%).  Defendants' 2017 overview reflects 16 closures in 2009 and 25 closures in 2010.

[14]    This table indicates 33 closures out of 899 stores in 2011; 21 of 935 in 2012; 35 of 950 in 2013; and 39 of 949 in 2014.  A graph provided by McKinsey around the same time (August 2016) shows an average closure rate of roughly 4% from 2011 to 2014.  (Ex. 186, Doc. 106-29 at p. 20).  Other exhibits show a similar rate from 2014 to 2016.  (Ex. 210, Doc. 106-48 at p. 4; and Ex. 210, Doc. 106-48 at p. 41).

[15]    Specifically, 53 of 937 stores in 2013; 56 of 950 stores in 2014; 37 of 949 stores in 2015; and 36 of 903 stores in 2016.

not establish that SAL intended for Plaintiffs to rely on this single bullet point in entering the agreements or that Plaintiffs were entitled to rely on it for that purpose notwithstanding their independent projections.

    <u>All Statements</u>

    While the Court recognizes that contractual releases do not excuse fraudulent inducement – that a party cannot be tricked into accepting hidden risks – it bears repeating here that Honor Capital, on behalf of all Plaintiffs, conducted its own inquiry, with the assistance of reputed financial and legal advisers, and signed 54 separate anti-reliance disclaimers in connection with the stores at issue here.  (<u>Doc. 95 at</u> p. 74-90).  Though Plaintiffs complain here that the SMART reports were unreliable, the SMART waivers plainly caution against reliance.  The anti-reliance disclaimers contained in SAL's Receipt, Waiver, and Disclaimer Agreement, SMART waivers, Incentive Election Forms, and Cash Flow Breakeven Reports put Plaintiffs on notice well before they closed on any store by signing the LSA and FOERA.  At every step of the process, Plaintiffs were explicitly discouraged from relying on any of SAL's representations, they were expected to conduct their own independent assessment, and they were not guaranteed any particular result.  Some of Honor Capital's own business plans contain a disclaimer stating that SAL makes no representations of business success.  (e.g., Ex. 110, <u>Doc. 100-5 at</u> p. 2).

    Even suspending the presumption of validity, at the very least, these repeated warnings belie Plaintiffs' assertion that SAL intended for Plaintiffs to rely on any of SAL's representations, or that Plaintiffs had a right to rely on them.  The absence of these elements is fatal to Plaintiffs' fraud claim regardless of any arguable doubt as to other factors.  When opposing parties tell two different stories and one is clearly contradicted by the record so that no reasonable jury could believe it, summary judgment is appropriate.  *Scott*, <u>550 U.S. at 380</u>.

Finally, there is no dispute that all of the foregoing representations were made by SAL before Defendants acquired the company.   Though Plaintiffs' pleadings focus heavily on statements by SAL, ultimately Plaintiffs appear to concede that SAL's statements prior to the acquisition cannot be imputed to Defendants.   Rather, Plaintiffs submit that Defendants continued SAL's fraudulent scheme after the acquisition by falsely promising licensees a turnaround instead of disclosing and correcting SAL's fraudulent business practices, causing Plaintiffs to forge ahead with seven more stores.   But the record does not permit a finding that SAL's conduct rises to the level of fraud in the first instance such that Defendants could be found to have continued or conspired in the "scheme."   And Defendants' own reports, plans, and correspondence consistently demonstrate Defendants' good faith intentions and efforts to improve SAL's operations and profits for the benefit of its investors and licensees alike.

For example, Defendants' July 2016 due diligence memo theorizes that improvements in merchandising and operating standards would, in turn, improve licensee store economics.   (Ex. 116; Doc. 101 at p. 23).   In August 2016, Defendants' consultants suggested that more needs to be done to allow licensees to compete on price.   (Ex. 188, Doc. 106-29 at p. 26).   Defendants' September 2016 memo anticipated cost savings from operational improvements to be re-invested in lower wholesale prices.   Ex. 117; Doc. 101-1 at p. 27).   From December 2016 to December 2017, SAL reduced its inside margin from 14.8% to 13.6%.   (Ex. 239, Doc. 106-75).   At worst, Defendants recognized that licensee revenue was an important component of SAL's financial picture.   ("[W]ith limited capital, the licensed model can be used to support/drive overall system growth."   Ex. 259, Doc. 106-95 at p. 4).   But Plaintiffs' suggestion that Defendants fleeced them by maintaining a longstanding model is not borne out by the record.

On the whole, the evidence demonstrates that Defendants intended and attempted to transform the business but did not succeed, much to their own detriment. The record thus defeats Plaintiffs' claim against Defendants for fraudulent inducement. And absent a factual basis for a finding of fraudulent inducement, the non-reliance disclaimers in the standard agreements bar Plaintiffs' remaining claims. *Rasby v. Pillen*, 905 F.3d 1097, 1102 (8th Cir. 2018). *See also Cicle v. Chase Bank USA*, 583 F.3d 549, 557 (8th Cir. 2009) (rejecting unconscionability argument with respect to form contracts). Though the central inquiry ends here, the Court nonetheless addresses Plaintiffs' dependent claims in an abundance of caution.

**Negligent Misrepresentation (Count IV)**

To prove negligent misrepresentation, a plaintiff must show that (1) the defendant supplied information in the course of business; (2) due to the defendant's failure to exercise reasonable care, the information was false; (3) the defendant intentionally provided such information for the guidance of a limited group of persons in a particular business transaction; (4) the plaintiff justifiably relied on the information; and (5) the plaintiff suffered pecuniary loss as a result. *Duncan v. Savannah, LLC*, 637 S.W.3d 633, 638–39 (Mo. App. E.D. 2021). Summary judgment on a negligent misrepresentation claim is proper when the proponent cannot provide proof of all elements of the tort. *W. Silver Recycling, Inc. v. Nidec Motor Corp.*, 4:20-CV-00837 JAR, 2022 WL 1421534, at *8 (E.D. Mo. May 5, 2022) (where discussions prior to closing did not support a claim of negligent misrepresentation). "Some metaphysical doubt as to the material facts is insufficient to avoid summary judgment. *Id.* at *9 (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)).

Applying these standards, again, the puffery on SAL's website is too vague to be clearly false, it was not provided to a limited group for a particular transaction, and Plaintiffs could not

justifiably rely on it in entering into the contracts.  The record also does not support a finding that the 4% failure rate stated in the lender presentation was false, or that SAL provided the information to Plaintiffs for their own guidance in entering the transaction, or that Plaintiffs' alleged reliance on the bullet point for that purpose was justified.  And Plaintiffs' allegations of misrepresentation regarding bona fide wholesale prices and SAL's franchise status are not actionable here for the reasons previously stated.

And again, even were there triable issues as to whether these statements were false, which the evidence does not support, these statements were made by SAL and are not attributable to Defendants.  Absent material, actionable misrepresentations, Plaintiffs' claim that Defendants failed to exercise reasonable care by not correcting them must also fail.

### RICO Claims (Counts I & II)

In their complaint, Plaintiffs allege that Defendants conspired with SAL to "sabotage" their stores by breaching the bona fide wholesale pricing and inventory delivery terms of their agreements and, in doing so, committed racketeering in the form of wire and mail fraud through inventory purchase orders, in violation of the RICO Act.  (Doc. 106-1 at p. 20; Doc. 115 at p. 106-107).

The RICO Act makes it unlawful to conduct the affairs of an enterprise through a pattern of racketeering activity.  18 U.S.C. § 1962(c).  Mail fraud and wire fraud are included in the definition of racketeering activity.  18 U.S.C. § 1961(1).  To establish a RICO conspiracy, a plaintiff must establish conduct satisfying § 1962(c) and further establish that a defendant either agreed to commit predicate acts in furtherance of the enterprise or agreed to participate in the conduct of the enterprise knowing that other members of the conspiracy would commit such acts. *Nestle Purina Petcare Co. v. Blue Buffalo Co. Ltd.*, 181 F. Supp. 3d 618, 634 (E.D. Mo. 2016).

But "RICO does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

Defendants argue that the record does not evidence fraud and, even if it did, a conspiracy cannot exist within a single corporate structure.  Indeed, Plaintiffs' RICO claims are predicated on an underlying act of fraud by SAL and the perpetuation of that fraud, at least by omission, by Defendants.  But, as discussed at length above, the voluminous summary judgment record does not create a triable fact question on that element.  There is no evidence from which a jury could infer that SAL or Defendants deliberately defrauded Plaintiffs, and their assertion that Defendants benefitted from an alleged conspiracy with SAL is negated by the fact that Defendants, too, lost their entire investment.  The Eighth Circuit rejects attempts to convert ordinary civil disputes into RICO cases, as the RICO Act was not intended to apply to claims of ordinary commercial fraud. *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015); *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1029 (8th Cir. 2008).

Moreover, a parent corporation and its wholly owned subsidiary are legally incapable of forming a conspiracy with one another.  *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898 (8th Cir. 1999) (granting summary judgment where defendant entities were part of one corporate family under common control).  Notwithstanding Onex's complicated corporate structure, it is uncontested that SAL was wholly under Defendants' ownership and control.[16]  Similarly, a corporation cannot conspire with its own employees unless they have an independent personal stake in the objectives of the conspiracy to benefit a legally distinct organization.  *8000 Maryland, LLC v. Huntleigh Fin. Services Inc.*, 292 S.W.3d 439, 452 (Mo. App. E.D. 2009).  *See also*

---

[16]     See Doc. 106-5; Doc. 106-96 at p. 13 (reflecting 100% ownership of SAL by Onex Partners IV); Doc. 106-109 (stock ledger identifying seven Onex entities issued SAL shares at closing).

*Creative Walking, Inc. v. Am. States Ins. Co.*, 25 S.W.3d 682, 688 (Mo. App. E.D. 2000) (instructing that an agent can be liable for conspiracy only when he acts out of a self-interest that goes beyond the agency relationship).  That is not the case here.  Although the Court is unable to ascertain exactly what Defendants Ross and Munk contributed to the SAL venture, Ross's deposition testimony indicates that Onex employees invest in projects through Onex funds as a profit-sharing component of their compensation (Doc. 106-4 at p. 5-6).  Plaintiffs acknowledge that Ross's compensation was tied to the success of his portfolio.  (Doc. 115 at p. 39).  Onex's post-acquisition stock ledger shows that SAL shares were issued to several individuals as director compensation.  (Doc. 106-109).  These minimal personal investments, as employee equity, do not divorce the individual Defendants' interests from those of Onex but instead serve to align them.  *Cf., Olsen as Tr. for Xurex, Inc. v. Di Mase*, 24 F.4th 1197, 1203 (8th Cir. 2022) (where agent had an independent stake as contractor or consultant for other parties).  Thus, even if the record presented triable questions on Plaintiffs' allegations of fraud by SAL or Defendants independently, Plaintiffs' RICO conspiracy claim would still fail as a matter of law because there can be no conspiracy within their corporate family.

**State Law Claims (Counts V, VI, & VII)**

Plaintiffs also assert state law claims for conspiracy to commit fraud, aiding and abetting fraud, and conspiracy to breach contract.  Defendants argue that Plaintiffs' state law conspiracy claims fail with their RICO claims, and that aiding and abetting is not cognizable under Missouri law.

Defendants are correct that a civil claim for aiding and abetting a tort is not cognizable under Missouri law.  *See Jo Ann Howard & Associates, P.C. v. Cassity*, 868 F.3d 637, 651 (8th Cir. 2017) (affirming dismissal of a claim of aiding and abetting as not recognized under Missouri

law); *Bader Farms, Inc. v. Monsanto Co.*, 1:16CV299-SNLJ, 2019 WL 3017425, at *7 (E.D. Mo. July 10, 2019) (collecting cases).

To state a claim for civil conspiracy under Missouri law, a plaintiff must establish that two or more persons with an unlawful objective, after a meeting of the minds, committed at least one act in furtherance of the conspiracy, with a resulting injury. *Higgins v. Ferrari*, 474 S.W.3d 630, 642 (Mo. App. W.D. 2015). Plaintiffs' claim of conspiracy to commit fraud must fail for the reasons discussed above with respect to Plaintiffs' RICO claims, namely the absence of an underlying fraud or independent actors.

Conspiracy to breach a contract is recognized as a plausible claim in Missouri. *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 587 (Mo. App. E.D. 2008) (likening the claim to one of conspiracy to destroy another's business). This cause of action arises when independent parties conspire to cause one party's violation of a contract with a third party, similar to a claim of tortious interference. *See Contour Chair Lounge Co. v. Aljean Furniture Mfg. Co.*, 403 S.W.2d 922, 927 (Mo. App. 1966) (citing *Rosen v. Alside, Inc.*, 248 S.W.2d 638, 643 (Mo. 1952)); s*ee also CGB Diversified Services, Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1025 (E.D. Mo. 2020) (recognizing a conspiracy to breach contract claim in a non-compete context). In their complaint, Plaintiffs allege that Defendants conspired to direct SAL to breach its agreements with Plaintiffs and destroy Plaintiffs' businesses by charging inflated prices and withholding credit and support services. Plaintiffs' grievances are breach-of-contract claims directed at SAL. As discussed above, the economic loss doctrine prohibits a plaintiff from seeking to recover in tort for economic losses that are contractual in nature. *Acol v. Travers Autoplex & RV, Inc.*, 637 S.W.3d 415, 421 (Mo. App. E.D. 2021). And even accepting the underlying allegations of breach, the intracorporate conspiracy doctrine bars any claim of conspiracy among Defendants or with SAL.

Plaintiffs' state law claims cannot survive summary judgment.

**Plaintiff AMFM**

Unlike the Plaintiff licensee stores, Plaintiff AMFM was an independent non-profit entity formed to operate a grocery delivery service out of the stores. SAL had no contractual relationship with AMFM, and there is no evidence that SAL played any part in AMFM's business beyond informally approving the concept as envisioned and proposed by Honor Capital.  The complaint fails to articulate free-standing claims by this Plaintiff.  According to Mr. Allen, AMFM's damages flowed from the failure of Plaintiffs' licensee stores "because there weren't any hubs to deliver out of anymore."  (Ex. 1, Doc. 95-1 at p. 17).  But SAL did not solicit AMFM's business or make any representations to AMFM.  The Court finds no theory in the complaint on which AMFM's claims could proceed independently.

**Sufficiency of the Record**

Finally, Plaintiffs argue that, if the Court finds the present record insufficient to create genuine issues of material fact, then the Court should permit Plaintiffs to conduct further discovery, particularly to establish their claims of fraudulent inducement.  Plaintiffs suggest that Defendants have withheld damaging documents and have improperly obtained other documents from SAL contrary to the parties' agreement.  Plaintiffs seek to obtain discovery directly from SAL to establish its knowledge and intent. Plaintiffs also wish to depose Onex's corporate representatives, Defendant Munk, and other members of Onex's due diligence team on the SAL acquisition to establish Defendants' own knowledge and intent.

As previously stated, because Defendants' lengthy motion to dismiss – consisting of 83 pages including exhibits – raised matters outside the pleadings (Doc. 31), the Court converted it into a motion for summary judgment and allowed the parties to engage in discovery to provide the

Court with the evidence needed to resolve the motion. (Docs. 43, 58).  Defendants advocated for limited discovery focusing on what Plaintiffs were told, and what they understood, before they signed SAL's standard contracts, as relevant to fraudulent inducement and thus the validity of Plaintiffs' releases.  (Doc. 60).  Plaintiffs proposed discovery in three phases: (1) Defendants' corporate structure, to confirm their entitlement to enforce the releases, (2) Defendants' knowledge of SAL's alleged misrepresentations to Plaintiffs as evidenced by Onex's files on the SAL acquisition, and (3) discovery directly from SAL concerning its representations to Plaintiffs.  (Doc. 59).

The Court granted the parties' requests in large part, except with respect to non-party SAL, which was reserved for later determination if necessary.  (Doc. 61).  Plaintiffs were ordered to produce communications with SAL and Defendants through January 3, 2018, as relevant to Plaintiffs' decision to execute SAL's standard contracts and releases.  Defendants were ordered to produce the communications and deal files of Ross, Munk, and any others on the deal team mentioning Plaintiffs and their principals or stores.  (Doc. 61).  As illustrated herein, this discovery yielded all materials Plaintiffs sought in their proposed second phase, including reports, memos, models, Defendants' investment thesis, investor communications, corporate versus licensee analysis, inside margins, franchise analysis, and data analytics.  (Doc. 59 at pp. 8-9).

After Defendants had produced over 5,600 documents comprising more than 86,000 pages and over 60 gigabytes of data, Plaintiffs filed a motion to compel seeking to expand discovery with respect to certain search terms and categories, which Defendants argued were either privileged or overbroad and wholly unrelated to the case.  (Docs. 73-75).  Finding Defendants' voluminous production sufficient for purposes of the key issues before it, the Court denied Plaintiffs' quest for further discovery.  (Doc. 73).

While the Court recognizes the unusual procedural evolution of this case and understands that fraud claims are fact-intensive, the Court nonetheless does not find additional discovery warranted.  Evidence of SAL's knowledge and intent in its dealings with Plaintiffs appears throughout the record.  Any further discovery on this subject would be largely duplicative and, in any case, futile as to each of Plaintiffs' theories.  As discussed above, many of the statements Plaintiffs claim to have relied on are simply too vague to be material, such as the puffery found on SAL's website.  Further, Plaintiffs claims of reliance are refuted by the record.  SAL explicitly cautioned Plaintiffs against relying on SMART reports, and Plaintiffs undertook their own investigation with respect to store locations and rejected many based on their own assessment, all before it signed the license contracts.  Similarly, the additional discovery Plaintiffs seek will not convert SAL's inside margin into a franchise fee, and Plaintiffs' claim that SAL did not intend to charge bona fide wholesale pricing is barred by the economic loss doctrine.  Finally, ample evidence supports a store closure rate around 4% and refutes Plaintiffs' estimate of 20%.

In short, Plaintiffs have been able to fully litigate their fraud claims on the existing record. Additional discovery would not change the Court's analysis and ultimately its conclusion that SAL's various representations are not actionable, let alone attributable to Defendants, for reasons unrelated to any party's knowledge and intent that might be revealed through further discovery.

## IV.    CONCLUSION

Plaintiffs' complaint and the voluminous record depict compellingly the noble efforts of decorated veterans to provide a critical service to underserved communities. The Court does not ignore the heroic commitment to country and community demonstrated by the individual members of Honor Capital and its Plaintiff entities.  As a matter of law, however, the Court must conclude that Defendants are entitled to summary judgment because the record does not give rise to disputes

of material fact permitting a jury to infer acts of fraud or conspiracy by Defendants, so the anti-reliance disclaimers in the governing contracts preclude Plaintiffs' claims

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED**.  (Doc. 84).

A separate Judgment will accompany this Memorandum and Order.

Dated this 24th day of March, 2023.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE